**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to:**<br><br>***Battisti, et al., v. The 3M Company, et al.,* 2:19-cv-00143-RMG** |
| DAVID BATTISTI, GORDON DITCHFIELD, REGINA SAUERACKER, MARY ANN BENSON, SUSAN SCHELL; CAROL SMITH and GERALD SMITH, her husband, ANITA PRINGLE and DAVID PRINGLE, her husband, JOHN HOLLOWAY, MARY JAMES and MARVIN JAMES, her husband, TIM BRANDENBURG, MATHEW LAWSON, MARY LAWSON, and ADAM HILL, for themselves and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co.,<br>TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company,<br>BUCKEYE FIRE EQUIPMENT CO.,<br>CHEMGUARD, INC.,<br>NATIONAL FOAM, INC.,<br>KIDDE-FENWAL, INC., f/k/a Fenwal Inc., individually and as successor-in-interest to Kidde Fire Fighting, Inc.,<br>E.I. DU PONT DE NEMOURS & COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise,<br>THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise,<br>THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to | **THIRD AMENDED CLASS ACTION COMPLAINT** |

DuPont Chemical Solutions Enterprise,
DUPONT DE NEMOURS, INC.,
  individually and as successor in interest to
  DuPont Chemical Solutions Enterprise,
AGC CHEMICALS AMERICAS, INC.,
AMEREX CORPORATION,
ARKEMA, INC., individually and as
  successor-in-interest to Atofina, S.A.,
ARCHROMA MANAGEMENT, LLC,
BASF CORPORATION, individually and as
  successor-in-interest to Ciba, Inc.,
CARRIER GLOBAL CORPORATION,
  individually and as successor-interest to
  Kidde-Fenwal, Inc.,
CHEMDESIGN PRODUCTS, INC.,
CHEMICALS, INC.,
CLARIANT CORPORATION, individually
  and as successor-in-interest to Sandoz
  Chemical Corporation,
CORTEVA, INC., individually and as
  successor-in-interest to DuPont Chemical
  Solutions Enterprise,
DEEPWATER CHEMICALS, INC.,
DYNAX CORPORATION, and NATION
FORD CHEMICAL COMPANY

                    Defendants.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

JURISDICTION AND VENUE ......................................................................... 5

THE PARTIES .................................................................................................... 6

Plaintiffs and Class Representatives ................................................................. 6

Defendants ........................................................................................................ 15

      i.      The AFFF Defendants ............................................................ 15

      ii.     The Fluorosurfactant Defendants ............................................ 19

      iii.    The PFC Defendants ............................................................... 24

GENERAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION ......... 26

A.     Manufacture and Use of Aqueous Film-Forming Foam ("AFFF") ...................... 26

B.     Health Advisories and Health Effects relating to Perfluorooctane Sulfonate ("PFOS") and Perfluorooctanoic Acid ("PFOA") .................................................. 30

C.     Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFAS ........................................................................................ 34

D.     AFFF Usage and the Resulting PFAS Contamination of the Fire College and Surrounding Area …………………………………………………………..... 44

E.     Plaintiffs and Putative Class Members' Exposures to PFAS and Damages .......... 47

F.     AFFF Containing PFAS is Fungible and Commingled in the Groundwater ........ 49

G.     Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability ........................................................................................................ 50

CLASS ALLEGATIONS ................................................................................... 50

A.     Class Definition ............................................................................................. 50

B.     Numerosity and Ascertainability ................................................................... 53

C.     Typicality ...................................................................................................... 53

D.      Adequacy of Representation ............................................................54

E.      Predominance of Common Issues .....................................................55

F.      Superiority........................................................................................56

**CAUSES OF ACTION** ...............................................................................**57**

A.      Count I – Negligence and Gross Negligence ..........................................57

B.      Count II – Strict Liability..................................................................64

C.      Count III – Medical Monitoring ........................................................69

D.      Count IV – Trespass………………………………………………………...74

E.      Count V – Private Nuisance…………………………………………….76

F.      Count VI – Loss of Consortium Claim ..............................................79

G.      Count VII – Fraudulent Transfer .......................................................80

**PUNITIVE DAMAGES** ...............................................................................**82**

**PRAYER FOR RELIEF** ...............................................................................**84**

**DEMAND FOR JURY TRIAL** ....................................................................**85**

## THIRD AMENDED CLASS ACTION COMPLAINT WITH INDIVIDUAL CLAIMS AND DEMAND FOR JURY TRIAL

Plaintiffs, DAVID BATTISTI, GORDON DITCHFIELD, REGINA SAUERACKER, MARY ANN BENSON, SUSAN SCHELL, CAROL SMITH and GERALD SMITH, her husband, ANITA PRINGLE and DAVID PRINGLE, her husband, JOHN HOLLOWAY, MARY JAMES and MARVIN JAMES, her husband, TIM BRANDENBURG, MATHEW LAWSON, MARY LAWSON, and ADAM HILL, for themselves and on behalf of all others similarly situated (collectively, "Plaintiffs" or "Class Members"), by and through their undersigned counsel, and pursuant to this Court's Case Management Order No. 3, hereby file this Third Amended Class Action Complaint with Individual Claims and Demand for Jury Trial, and make these allegations based on information and belief against Defendants, THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co., TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC., f/k/a Fenwal Inc., individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS,

INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY (collectively, "Defendants"), and allege as follows:

## I.    **INTRODUCTION**

1.    Plaintiffs, current and retired firefighters and personnel, who worked and/or trained at the Florida State Fire College located at 11655 NW Gainesville Road, Ocala, Florida 34482 ("Fire College") and the area surrounding the Fire College (the "Surrounding Area"), [1] bring this action for themselves and on behalf of a Class of similarly-situated individuals (the "Class"), for damages sustained to their person and for medical monitoring resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") in AFFF firefighting aqueous film-forming foams ("AFFF") and/or chemical feedstock[2] used in AFFF marketed, manufactured, designed, sold, supplied, and/or distributed by each of the above-named Defendants, individually or through their predecessors or subsidiaries, despite the toxicity, persistence, and bioaccumulation concerns associated with PFAS.

2.    PFAS are synthetic, toxic chemicals that include perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), GenX chemicals, and/or other per- and polyfluoroalkyl substances and their precursors, perfluorochemicals ("PFCs"), used in manufactured products to repel oil, grease, and water, making them effective firefighting

---

[1] The term "Surrounding Area" is defined in Section IV herein as all locations within the outer (second) red circle in the FDEP's Florida State Fire College Well Sampling.

[2] The PFAS chemicals utilized to manufacture AFFF products are generally referred to as "chemical feedstocks."

suppressant agents. PFAS are also known as "forever chemicals" because they are immune to degradation, concentrate in human blood, bones, and organs, and increase in concentration up the food chain.

3.  PFAS exposure can occur through inhalation, ingestion, and dermal contact[3] and is associated with serious adverse health effects in humans, including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, and epigenetic changes associated with carcinogenesis. Most recently, evidence from human and animal studies shows that PFAS exposure may reduce antibody responses to vaccines, which is a significant concern in light of COVID-19.

4.  On or about August 2018, the Florida Department of Environmental Protection Agency ("FDEP"), began testing the wells at the Fire College and found significantly elevated levels of PFOS and PFOA, far greater than the national average, as a result of Defendants' contamination of the Fire College's water supply, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains. PFAS levels vastly exceed the United States Environmental Protection Agency's ("EPA") previous health advisory limit of 0.07 parts per billion (ppb) or 70 parts per trillion (ppt). Prior to the FDEP's findings, there was no notice provided to the Plaintiffs and Putative Class Members that the Fire College's water supplies were contaminated with PFOS and PFOA.

5.  In the months following the FDEP's discovery of PFAS contamination at the Fire College, the FDEP, in conjunction with the Florida Department of Health ("FDOH"), began testing

---

[3] Suzanne E. Fenton, MS, PhD, PFAS Collection, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

private wells and soil in the area surrounding the Fire College, including the Lhoist Mine and Lhoist-Lowell Plant (collectively, "Lhoist"), which is located adjacent to the Fire College. Several of these tests yielded results in exceedance of the State and Federal safe drinking water limits.

6.     Over the course of the past several decades, Plaintiffs and Putative Class Members routinely used and were exposed to the Defendants' products and/or were exposed to PFOS- and PFOA- contaminated water at the Fire College, and the Surrounding Area, where the Defendants' AFFF products and/or chemical feedstocks were used and stored resulting in significant personal injuries and the need for medical monitoring.

7.     PFAS are highly toxic and carcinogenic chemicals. Defendants knew or should have known that PFAS are persistent when released into the environment and present significant risks to human health and the environment.

8.     Nevertheless, the Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed AFFF products and/or chemical feedstocks containing PFAS when they knew or reasonably should have known that these harmful compounds would be released into the air, soil, and groundwater during firefighting training exercises and in firefighting emergencies, and would threaten the health and welfare of firefighters and other individuals exposed to these dangerous and hazardous chemicals.

9.     Defendants' PFAS- containing AFFF products were used by Plaintiffs, and others at the Fire College, in their intended manner, without significant change in the products' condition. Being unaware of the dangerous properties of Defendants' AFFF products, Plaintiffs relied on Defendants' instructions as to proper methods of handling the products. Plaintiffs' consumption, inhalation, and/or dermal absorption of PFAS from Defendants' AFFF products caused Plaintiffs

to develop numerous serious medical conditions, including, but not limited to, thyroid disease, kidney cancer and/or end-stage kidney disease, ulcerative colitis, and hypercholesterolemia.

10.     Through this action, the Plaintiffs, for themselves and on behalf of the Putative Class, seek to recover compensatory and punitive damages arising out of the permanent and significant damages sustained as a direct result of their exposure to the Defendants' PFAS- -containing AFFF products and/or to PFAS-- contaminated groundwater, surface water, and/or affected areas from the use and/or storage of the Defendants' AFFF products at the Fire College. Plaintiffs, for themselves and on behalf of the Putative Class, also seek an order directing Defendants to create, fund and support a medical monitoring program.

## II.     <u>JURISDICTION AND VENUE</u>

11.     This Complaint was filed as an original action in the Ocala Division of the United States District Court for the Middle District of Florida ("Original District") pursuant to 28 U.S.C. § 1391.

12.     On January 10, 2019, this action was transferred to the United States District for the District of South Carolina for coordinated or consolidated proceedings in the matter of *In Re: Aqueous Film-Forming Foams (AFFF) Multidistrict Products Liability Litigation*, Case No.: 2:18-mn-02873-RMG (MDL No. 2873) (ECF No. 5).

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) and (d)(2) and the Class Action Fairness Act ("CAFA") Pub.L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.). *See* 28 U.S.C. § 1711, *et seq.* Many members of the proposed Class are citizens of a state different from Defendants and the amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs, and there are more than 100 Putative Class Members.

- 5 -

14.    For the subclass, the Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

15.    This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with the State of Florida, including, among other things, purposefully marketing, selling and/or distributing their AFFF products within the State of Florida, and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction.

16.    Venue is proper in the Original District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. §1965, because a substantial part of the events or omissions giving rise to the claim occurred in the Original District and because the subject contaminated site that is the subject of this action is located within the Original District.

III.    **PARTIES**

A.    **Plaintiffs and Class Representatives**

17.    Plaintiff David Battisti is a citizen of Tamarac, Florida, who has resided at all material times at 6940 NW 83rd Terrace, Tamarac, Florida 33321. At all material times, Plaintiff David Battisti worked as a firefighter in or around Ocala, Florida, and worked as a firefighter instructor at the Fire College. During Mr. Battisti's employment as a firefighter and firefighter instructor, he was exposed to elevated levels of PFAS as a result of regular contact with the Defendants' AFFF firefighting foam products and/or consumption of PFAS-contaminated water, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

18.    Plaintiff David Battisti has suffered from thyroid disease as a direct result of his exposure to PFAS and is at an increased risk of several health effects, including, but not limited

to, effects on the liver and immune system, kidney cancer, testicular cancer, high cholesterol, colitis, and autoimmune diseases.

19.    Plaintiff David Battisti has a legitimate fear of developing debilitating injuries as a result of his exposure to PFAS, including, but not limited to, effects on the liver and immune system, high cholesterol levels, kidney cancer, testicular cancer, colitis, and autoimmune diseases.

20.    Plaintiff Gordon Ditchfield is a citizen of Beverly Hills, Florida, who has resided at all material times at 4524 W Pinto Loop, Beverly Hills, Florida 34465. At all material times, Plaintiff Gordon Ditchfield worked as a firefighter in or around Ocala, Florida and was a firefighter trainee at the Fire College. During Mr. Ditchfield's employment as a firefighter and firefighter trainee, he was significantly exposed to elevated levels of PFAS in their concentrated form as a result of regular contact with the Defendants' AFFF products and through PFAS having contaminated the Fire College well system, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

21.    Plaintiff Gordon Ditchfield has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, testicular cancer, colitis, and autoimmune diseases.

22.    Plaintiff Regina Saueracker is a citizen of Ocala, Florida, who has resided at all material times at 4725 SW 110th Street, Ocala, Florida 34476. At all material times, Plaintiff Regina Saueracker worked as an operations management consultant at the Fire College. During Plaintiff Regina Saueracker's employment as an operations management consultant, she was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the

accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

23.     Plaintiff Regina Saueracker has suffered from thyroid disease, kidney disease resulting in bilateral renal masses, and ulcerative colitis as a direct result of her exposure to PFAS and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, and autoimmune diseases.

24.     Plaintiff Regina Saueracker has a legitimate fear of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, and autoimmune diseases.

25.     Plaintiff Mary Ann Benson is a citizen of Ocala, Florida, who has resided at all material times at 3216 SE 54th Circle, Ocala, Florida 33480. At all material times, Plaintiff Mary Ann Benson worked as an administrative assistant at the Fire College. During Plaintiff Mary Ann Benson's employment as an administrative assistant, she was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

26.     Plaintiff Mary Ann Benson has suffered from thyroid disease and breast cancer as a direct result of her exposure to PFAS and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, kidney cancer, testicular cancer, high cholesterol, colitis, and autoimmune diseases.

27.     Plaintiff Mary Ann Benson has a legitimate fear of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, colitis, and autoimmune diseases.

28.    Plaintiff Susan Schell is a citizen of Ocala, Florida, who has resided at all material times at 10886 SW 45th Terrace, Ocala, Florida 34476. At all material times, Plaintiff Susan Schell worked at the Fire College.  During Plaintiff Susan Schell's employment, she was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the accumulation of PFOS and PFOA in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

29.    Plaintiff Susan Schell has suffered from end-stage kidney disease as a direct result of her exposure to PFAS and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

30.    Plaintiff Susan Schell has a legitimate fear of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

31.    Plaintiff Carol Smith is a citizen of Ocala, Florida, who has resided at all material times at 8265 SW 115th Lane, Ocala, Florida 34481. At all material times, Plaintiff Carol Smith worked as a Senior Clerk Registrar at the Fire College.  During Plaintiff Carol Smith's employment, she was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

32.    Plaintiff Carol Smith has suffered from thyroid disease as a direct result of her exposure to PFAS and is at an increased risk of several health effects, including but not limited to

effects on the liver and immune system, kidney cancer, testicular cancer, high cholesterol, colitis, and autoimmune diseases.

33.     Plaintiff Carol Smith has a legitimate fear of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

34.     Plaintiff Gerald Smith is a citizen of Ocala, Florida, who has resided at all material times at 8265 SW 115th Lane, Ocala, Florida 34481.  At all times material, Gerald Smith was and is the husband of Carol Smith.

35.     Plaintiff Anita Pringle is a citizen of Ocala, Florida, who has resided at all material times at 3231 NE 42nd Place, Ocala, Florida 34479.   At all material times, Plaintiff Anita Pringle worked as an administrative assistant at the Fire College.   During Plaintiff Anita Pringle's employment as an administrative assistant, she was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

36.     Plaintiff Anita Pringle has suffered from thyroid disease and parathyroid cancer as a direct result of her exposure to PFAS and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

37.     Plaintiff Anita Pringle has a legitimate fear of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

38.     Plaintiff David Pringle is a citizen of Ocala, Florida, who has resided at all material times at 3231 NE 42nd Place, Ocala, Florida 34479. At all material times, David Pringle was and is the husband of Anita Pringle.

39.     Plaintiff John Holloway is a citizen of Fort McCoy, Florida, who has resided at all material times at 16221 NE 139th Ter, Fort McCoy, Florida 32134. At all material times, Plaintiff John Holloway worked as a maintenance superintendent at the Fire College. During Plaintiff John Holloway's employment as a maintenance superintendent, he was significantly exposed to elevated levels of PFAS in Defendants' AFFF products through contamination in the Fire College well system, including, but not limited to, through the accumulation of PFAS in the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains.

40.     Plaintiff John Holloway has suffered from prostate cancer as a direct result of his exposure to PFAS and is at an increased risk of several health effects, including but not limited to effects on the liver and immune system, kidney cancer, breast cancer, high cholesterol, colitis, and autoimmune diseases.

41.     Plaintiff John Holloway has a legitimate fear of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

42.     Plaintiff Mary James is a citizen of Reddick, Florida, who has resided at all material times at 12350 NW 39 Cir., Reddick, Florida 32686, which is located approximately 1000 feet northeast of the Fire College.  On or about December 21, 2018, Plaintiff Mary James received a letter from the FDEP stating that they determined that the PFAS levels detected in her private well exceeded the State and Federal safe drinking water limits.  At all material times, Plaintiff Mary James was significantly exposed to elevated levels of PFAS in Defendants' AFFF products,

through contamination at the Fire College, which contaminated the water in her nearby private well. On a daily basis, Plaintiff Mary James consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

43.    Plaintiff Mary James has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

44.    At all times material, Plaintiff Marvin James was and is the husband of Mary James. Plaintiff Marvin James is a citizen of Reddick, Florida, who has resided at all material times at 12350 NW 39 Cir., Reddick, Florida 32686, which is located approximately 1000 feet northeast of the Fire College.  On or about December 21, 2018, Plaintiff Marvin James received a letter from the FDEP stating that they determined that the PFAS levels detected in his private well exceeded the State and Federal safe drinking water limits.  At all material times, Plaintiff Marvin James was significantly exposed to elevated levels of PFAS in Defendants' AFFF products, through contamination at the Fire College, which contaminated the water in his nearby private well.  On a daily basis, Plaintiff Marvin James consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

45.    Plaintiff Marvin James has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, testicular cancer, breast cancer, colitis, and autoimmune diseases.

46.    Plaintiff Tim Brandenburg is a citizen of Reddick, Florida, who has resided at all material times at 12169 NW Old Gainesville Road, Reddick, Florida 32686, which is located

- 12 -

approximately 1000 feet north of the Fire College. On or about December 21, 2018, Plaintiff Tim Brandenburg was notified that the FDEP determined that the PFAS levels detected in his private well exceeded the State and Federal safe drinking water limits.  At all material times, Plaintiff Tim Brandenburg was significantly exposed to elevated levels of PFAS in Defendants' AFFF products, through contamination at the Fire College, which contaminated the water in his nearby private well.  On a daily basis, Plaintiff Tim Brandenburg consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

47.    Plaintiff Tim Brandenburg has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, testicular cancer, breast cancer, colitis, and autoimmune diseases.

48.    Plaintiff Mathew Lawson is a citizen of Reddick, Florida, who has resided at all material times at 12169 NW Old Gainesville Road, Reddick, Florida 32686, which is located approximately 1000 feet north of the Fire College. On or about December 21, 2018, Plaintiff Mathew Lawson was notified that the FDEP determined that the PFAS levels detected in his private well exceeded the State and Federal safe drinking water limits.  At all material times, Plaintiff Mathew Lawson was significantly exposed to elevated levels of PFAS in Defendants' AFFF products, through contamination at the Fire College, which contaminated the water in his nearby private well.  On a daily basis, Plaintiff Mathew Lawson consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

49.    Plaintiff Mathew Lawson has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to

effects on the liver and immune system, high cholesterol levels, kidney cancer, testicular cancer, breast cancer, colitis, and autoimmune diseases.

50.    Plaintiff Mary Lawson is Mathew Lawson's mother. Plaintiff Mary Lawson is a citizen of Reddick, Florida, who has resided at all material times at 12169 NW Old Gainesville Road, Reddick, Florida 32686, which is located approximately 1000 feet north of the Fire College. On or about December 21, 2018, Plaintiff Mary Lawson was notified that the FDEP determined that the PFAS levels detected in her private well exceeded the State and Federal safe drinking water limits.  At all material times, Plaintiff Mary Lawson was significantly exposed to elevated levels of PFAS in Defendants' AFFF products, through contamination at the Fire College, which contaminated the water in her nearby private well. On a daily basis, Plaintiff Mary Lawson consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

51.    Plaintiff Mary Lawson has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of her exposure to PFAS, including but not limited to effects on the liver and immune system, high cholesterol levels, kidney cancer, breast cancer, colitis, and autoimmune diseases.

52.    At all times material, Plaintiff Adam Hill is a citizen of Reddick, Florida who worked at Lhoist, which is located adjacent to the Fire College. During Plaintiff Adam Hill's employment at Lhoist, he was significantly exposed to elevated levels of PFAS Defendants' AFFF products through contamination at the Fire College, which contaminated the water at Lhoist.  On a daily basis, Plaintiff Adam Hill consumed, used, and handled such contaminated water for drinking, cooking, and bathing.

53.    Plaintiff Adam Hill has a legitimate fear, and is at an increased risk, of developing debilitating injuries as a result of his exposure to PFAS, including but not limited to effects on the

- 14 -

liver and immune system, high cholesterol levels, kidney cancer, testicular, breast cancer, colitis, and autoimmune diseases.

54.    The proposed class representatives are Plaintiffs, David Battisti, Gordon Ditchfield, Regina Saueracker, Mary Ann Benson, Susan Schell, Carol Smith, Anita Pringle, John Holloway, Mary James, Marvin James, Tim Brandenburg, Mathew Lawson, Mary Lawson, and Adam Hill. Each of the proposed class representatives, at all times material, have been exposed to greater than normal background levels of PFAS as a result of their use and/or consumption, inhalation or dermal absorption of PFAS from the Defendants' AFFF products and, as a result, are at an increased risk of developing serious adverse health effects.

### B.    Defendants

55.    The term "Defendants" refers to all Defendants named herein jointly and severally.

   i.    <u>The AFFF Defendants</u>

56.    The term "AFFF Defendants" refers collectively to Defendants 3M Company, Amerex Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, Chemguard Inc., Kidde-Fenwal, Inc., National Foam, Inc., and Tyco Fire Products L.P.

57.    Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

58.    Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, trained users, produced instructional materials, and/or sold AFFF containing PFAS, including, but not limited to, in Florida, in such a way as to result in the contamination of Plaintiffs' and the other Class Members' blood and/or bodies with PFAS, and the biopersistence and bioaccumulation of such PFAS in such blood and/or bodies.

59.    Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

60.    Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

61.    In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

62.    On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

63.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

64.    Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

65.    Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

66.    After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

67.    Defendant Chemguard, Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street,

Marinette, Wisconsin 54143.

68.    On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

69.    On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

70.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

71.    On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

72.    Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

73.    Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

74.    On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

75.    On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

76.    On information and belief, Chubb was acquired by Williams Holdings in 1997.

- 17 -

77.     On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

78.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

79.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

80.     On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

81.     On information and belief, Angus Fire Armour Corporation and National Foam businesses separated from United Technologies Corporation in or around June 2013.

82.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

83.     On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation.

84.     On information and belief, Kidde-Fenwal is the entity that in June 2013 divested the AFFF business unit now operated by National Foam.

85.     Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

86.     On information and belief, Carrier was formed in March 2020 when United

Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

87.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at the Fire College.

ii.    The Fluorosurfactant Defendants

88.    The term "Fluorosurfactant Defendants" refers collectively to Defendants 3M, Arkema Inc., ChemDesign Products Incorporated, Chemguard Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours Inc., and Dynax Corporation.

89.    Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

90.    On information and belief, beginning sometime in the early 1970s, the French chemical company Atochem designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

91.    On information and belief, when Atochem's parent company, Elf-Acquitaine, merged with TotalFina in 1999 to form TotalFinaElf, the two companies combined their chemical operations to create Atofina S.A. ("Atofina"). On information and belief, Atofina continued to

design, manufacture, market, distribute, and sell fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

92.     On information and belief, Atofina sold its fluorosurfactant business to Dupont Chemical Solutions Enterprise in September 2002.

93.     On information and belief, Arkema was created in October 2004 when TotalFinaElf spun off Atofina.  On information and belief, Arkema is the successor in interest to Atofina and is legally responsible for the liabilities arising from the manufacture of fluorosurfactants used in AFFF by Atofina and its predecessors before September 2002.

94.     Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

95.     On information and belief, BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

96.     On information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

97.     Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

98.     On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

99.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized

under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

100.     On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

101.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

102.     On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

103.     On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

104.     Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

105.     Defendant The Chemours Company ("Chemours Co.") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

106.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants.  On information and belief, Chemours Co. has supplied

- 21 -

fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

107. On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

108. In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

109. Defendant The Chemours Company FC, LLC ("Chemours FC") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

110. Defendant Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

111. Defendant Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

112. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

113. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

114.    On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

115.    Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

116.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

117.    Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

118.    On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

119.    On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

120.    On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at the Fire College.

iii.    The PFC Defendants

121.    The term "PFC Defendants" refers collectively to 3M, AGC Chemicals Americas

Inc., Archroma Management LLC, ChemDesign Products Inc., Chemicals, Inc., Clariant

Corporation, Deepwater Chemicals, Inc., E. I. DuPont de Nemours and Company, The Chemours

Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., and Nation

Ford Chemical Company.

122.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a corporation organized and

existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan

Avenue, Suite 201, Exton, PA 19341.

123.    On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and

is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its

principal place of business in Tokyo, Japan.

124.    AGC manufactures specialty chemicals.  It offers glass, electronic displays, and

chemical products, including resins, water and oil repellants, greenhouse films, silica additives,

and various fluorointermediates.

125.    On information and belief, AGC designed, manufactured, marketed, distributed,

and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing

the fluorosurfactants used in AFFF products.

126.    Defendant Clariant Corporation ("Clariant") is a corporation organized and existing

under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte,

North Carolina 28205.

127.    On information and belief, Clariant is the successor in interest to the specialty

chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief,

Sandoz spun off its specialty chemicals business to form Clariant in 1995.

128.    On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

129.    Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

130.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

131.    On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

132.    Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

133.    On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

134.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

135.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA,

and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

136.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

137.    Defendants represent all or substantially all of the market for AFFF products at the Fire College.

## IV.    GENERAL FACTUAL ALLEGATIONS

### A.    Manufacture and Use of Aqueous Film-Forming Foam ("AFFF")

138.    AFFF formulations are chemical mixtures used to extinguish hydrocarbon fuel-based fires.

139.    AFFF containing fluorinated surfactants have a better firefighting capability than plain water due to their surface-tension lowering properties- essentially smothering the fire and starving it of its oxygen.

140.    However, some fluorinated surfactants have unique properties that cause some of the compounds to not biodegrade and to bioaccumulate, and are toxic to animals and humans.

141.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

142.    AFFF was introduced commercially in the mid-1960s and rapidly became the primary firefighting foam in the U.S. and in many parts of the world.

143.    AFFF is synthetically formed by combining fluorine free hydrocarbon foaming agents with surfactants. When mixed with water, the resulting solution produces an aqueous film

that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film forming foam.

144.    Defendants manufacture products that contain fluorocarbon surfactants believed to include PFOS, PFOA, and/or certain other PFCs that degrade into PFAS.

145.    PFCs are manmade chemicals that do not exist in nature.

146.    In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water. AFFF concentrates contain about 60-90% water and have a fluorine content of about 0.3 – 1.8%.

147.    Defendants 3M, Tyco/Ansul, National Foam, Chemguard and Buckeye designed, manufactured, and sold AFFF that was used at the Fire College, including, but not limited to, National Foam's AER-O-Foam XL-3 3%, used in training operations and for emergency fire-fighting situations.

148.    PFCs used in 3M's AFFF were produced by a unique and patented process known as electrochemical fluorination ("ECF"). The ECF process resulted in a product that contains PFOS, some of which degrades into PFOA.

149.    3M was the only company to manufacture PFOS-containing AFFF.

150.    In an attempt to limit liability, 3M opted to stop producing PFOS 2002 because it was aware of the looming chemical exposure and health effects on the public.

151.    Similarly, PFOA is a man-made, manufactured chemical not found in nature. PFOA was used to make household and commercial products that resist heat and chemical reactions, and has many uses, including repelling oil, stains, grease, and water.

152.    In 1947, 3M began producing PFOA via ECF.

153.    In 1951, 3M began selling its PFOA to other chemical companies, including DuPont.

154.    Other companies, such as Defendants Tyco/Ansul, Buckeye, National Foam, and Chemguard began manufacturing AFFF using PFOA that they produced themselves or purchased from other companies. Defendants' AFFF was then for use at airports, fire departments and industrial facilities across the nation.

155.    The chemical structure of PFAS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment. Some PFAS, such as PFOS and PFOA, have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

156.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont Chemical Solutions Enterprise indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

157.    Early studies showed that PFC's accumulated in the human body and were "toxic." 3M studies from the 1970s concluded that PFC's were "even more toxic" than previously believed.

158.    In 1976, 3M found PFOA was persistent in the blood of its workers. This should have alerted 3M to the same issue raised by findings regarding PFOS in the prior year. 3M communicated its findings to DuPont Chemical Solutions Enterprise, but not to industry regulatory agencies.

159.    Upon information and belief, by the 1970's, 3M and DuPont Chemical Solutions Enterprise knew that their PFC's (PFOA and PFOS) were widely present in the blood of the general

U.S. population and would accumulate and build up in the blood/body of the exposed individuals with each additional exposure. Upon information and belief, 3M and DuPont Chemical Solutions Enterprise concealed this knowledge from the public and government regulators.

160.     In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

161.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont Chemical Solutions Enterprise, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

162.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont Chemical Solutions Enterprise, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic) in a second chronic cancer study in rats.

163.     PFAS are readily absorbed after consumption, inhalation or dermal absorption, and it accumulates primarily in the blood stream, kidney, and liver.

164.     Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary

commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

165.    PFOA can remain in the environment, particularly in water, for many years and can move through air, soil, and into groundwater.

166.    Human studies show associations between increased PFOA levels in blood and an increased risk of several health conditions, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

167.    These injuries can arise months or years after exposure to PFOA.

168.    According to the EPA's Lifetime HAs, the adverse health effects observed following exposure to PFOS are the same as those observed with PFOA, meaning injuries associated with PFOS exposure and accumulation similarly manifest themselves months or years after initial exposure.

169.    Due to the extreme persistence of PFAS in the environment, these chemicals' toxicity, mobility, and bioaccumulation potential pose ongoing and probable adverse effects to human health and the environment.

170.    Consumption of elevated levels of PFAS from contaminated water will lead to elevated serum PFAS levels with evidence that for every 10 ppt consumed from contaminated water, serum levels increase by 25%, thereby causing a doubling of serum levels at 40 ppt. Once biological uptake occurs, the clinical effect can be proximate to the exposure or following a latency or both.

**B.    Health Advisories and Health Effects relating to PFOS and PFOA**

- 30 -

171.    Many parties have studied PFOS and PFOA, sometimes referred to as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

172.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

173.    The non-cancer health effects of PFOS are the same as PFOA.

174.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[4]

175.    On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[5] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016. The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identified the concentration

---

[4] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[5] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOSs. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

a.  Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b.  Cancer (testicular and kidney);

c.  Liver effects (tissue damage);

d.  Immune effects (e.g., antibody production and immunity);

e.  Thyroid disease and other effects (e.g., cholesterol changes).

176.    Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

177.    Currently Florida follows the previous EPA level of 70 ppt for combined PFOA and PFOS levels.

178.    In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health." *Id*; *see also, National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.")

179.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015.

180.    PFOS and PFOA are such contaminants. *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

181.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[6]

182.    The IARC concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[7]

183.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

184.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 Million to remediate PFC contamination from military bases, as well as devoting $7 Million toward the Investing in Testing

---

[6] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[7] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.

185.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

186.    On June 15, 2022, the EPA released four drinking water health advisories for PFAS:[8]

    a.  Interim updated health advisory for PFOA = .004 ppt
    b.  Interim updated health advisory for PFOS = .02 ppt
    c.  Final health advisory for GenX chemicals = 10 ppt
    d.  Final health advisory for PFBS = 2,000 ppt

**C.    Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFAS and PFOA**

187.    On information and belief, by at least the 1970s 3M and DuPont Chemical Solutions Enterprise knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

188.    Upon information and belief, 3M and DuPont Chemical Solutions Enterprise concealed from the public and government agencies its knowledge of the risk of harm posed by PFAS.

189.    In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted

---

[8] https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last visited July 22, 2022).

3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in blood from 3M's products.

190.    In 1976, 3M found PFOA in the blood of its workers. This finding should have alerted 3M to the same issues raised by the findings regarding PFOS in the prior year.

191.    A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs.

192.    Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

193.    Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS.

194.    In a 1983 study, for example, 3M found that PFOS caused the growth of cancerous tumors in rats.

195.    A study proposal by 3M in 1983 stated that the resistance to degradation of PFOS and PFOA made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

196.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, 3M's MSDSs for AFFF did not provide similar warnings.

- 35 -

197.    Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

198.    3M did not comply with its duty under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOS or PFOA and other per-fluoroalkyl substances dating back decades, among other things.

199.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."    The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA. substantial risk information about chemicals they manufacture, process or distribute in commerce."

200.    On information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment. On information and belief, this knowledge was accessible to all defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following Defendants are and/or were members of this trade association: 3M, Tyco/Ansul, Chemguard, and National Foam/Angus.

201.    Additionally, on information and belief, all Defendants knew or should have known that their AFFF and/or chemical feedstocks and the PFOA and PFOS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature

of the products' chemical composition, and on information and belief the products had long shelf-lives; and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in at least 1976.

202.    The Defendants failed to warn and share information with its customers regarding the danger of their products to the quality of unprotected water sources.

203.    Defendants' products created major waste management problems which they absolved themselves of, providing their customers with no practical guidance and instructions on how to deal with.

204.    Some or all of the Defendants understood how stable the fluorinated surfactants used in their AFFF formulations are when released into the environment from the first sale to their customers but neither warned customers nor provided reasonable instruction on how to manage wastes generated from use of their products. The persistence and contaminating nature of the perfluorinated surfactant 3M made that went into its AFFF products was well understood prior to the commercial applications of these surfactants at 3M's Cottage Grove facility in Minnesota.

205.    The inventor of 3M's surfactants was J. H. Simons. Simons' 1948 patent (Simons[9]) reports: PFCs are "non-corrosive, and of little chemical reactivity"; "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."

206.    Simons reported that the surfactants that 3M specified for its AFFF do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. These highly stable chemicals were developed to provide non-reactive

---

[9] Simons, J. H., U.S. Patent No. 2,447,717. August 24, 1948.

solid and liquid chemicals with low surface tensions that could withstand high temperatures and would not react with highly reactive materials such as oxygen (*see* Simons[10], Bryce[11]). 3M understood that the stability of the carbon-to-fluorine bonds and the lack of attraction for other chemical species prevent these surfactants from undergoing further chemical reactions or degrading under natural processes in the environment (*see* Simons 1950 published work[12]).

207.    Bryce an employee of 3M, published an authoritative treatise stating "[t]his chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon." (Bryce (1964)).

208.    The thermal stability of 3M's surfactants was understood prior to commercial production. In 1947, two researchers reported that fluorocarbon compounds did not degrade at temperatures as high as 500º C (932ºF), even in the presence of catalytic materials (Grosse, et al.[13]). Simons' patent application further discloses that the chemicals he invented were thermally stable at temperatures up to 750° C (1382º F) (see Simons (1948); Simons et al., (1949)). These chemicals are non-reactive and thermally stable due to the strength and stability of the carbon-to-fluorine bonds (Simons (1949); Bryce (1950)[14]). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds. Bryce explained that the

---

[10] Simons, J. H., 1949. Fluorocarbons. Scientific American, Inc., 181(5): 44-47.

[11] Bryce, H. G., 1964. Industrial and Utilitarian Aspects of Fluorine Chemistry. Fluorine Chemistry. 5(4): 295-498.

[12] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422.

[13] Grosse, A. V., et al., 1947. Properties of Fluorocarbons. Industrial and Engineering Chemistry, 39(3): 367-374. March.

[14] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

fracture of the carbon-to-carbon bonds may take place at very high temperatures from 600 to 1000°

C (1112 to 1832° F) depending on the carbon chain length. He also reported that the carbon-to-

fluorine bond is much stronger and can require temperatures of 1200° C (2192° F) to break (Bryce,

1964).

209.    Nowhere in any Material Safety Data Sheet for any of the defendants' products is

information on the thermal stability of their surfactants disclosed. Failure to disclose knowledge

of how stable the chemical ingredients in the AFFF product to customers is a failure to warn just

how indestructible the surfactant ingredients are when released to unprotected water sources and

even treatment plants. The remarkable thermal stability of the surfactants used in defendants'

formulations means that there is a risk that the customer has to deal with because the surfactant

ingredients are incredibly stable. The surfactant additive is so stable that it is indestructible under

normal use and environmental conditions; facts which are known by AFFF chemical feedstock

manufacturers and not apparent to the users of these products.

210.    Defendant 3M was capable of producing a variety of perfluorinated products at its

Cottage Grove facility (PFOS, PFOA, and PFBA, in addition to the salts of PFOS, PFOA, and

PFBA). All of these surfactants were understood by 3M to readily dissolve in water. In 1962,

testing of PFOS-based surfactants indicated that these compounds were very soluble (Guenthner,

et al.[15]). Numerous PFCs manufactured by 3M, including fluorocarbon carboxylic acids and

fluorocarbon sulfonic acids such as PFOA and PFOS readily dissolve when mixed with water

(Bryce (1964)). 3M knew by 1964 that when dissolved, fluorocarbon carboxylic acids and

fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and

---

[15] Guenthner, R. A., et al., 1962. Surface Active Materials From Perfluorocarboxylic and
Perfluorosulfonic Acids, 1(3): 165-168.

perfluorosulfonate ions (Bryce (1964)). Later studies by 3M on the adsorption and mobility of FC-95 and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[16]

211.    Defendant 3M understood from the earliest days it acquired the Simons' patents that the surfactants it commercialized had extremely limited reactivity and that the high thermal stability of the perfluorinated carbon chain inhibited degradation in the environment (Bryce, 1950). The breaking of a carbon-to-fluorine bond requires the input of large amounts of energy to overcome the chemical bond between carbon and fluorine. Chemical and physical processes occurring in nature lack sufficient energy to break carbon-to-fluorine bonds and without this input of energy, the carbon-to-fluorine bonds remain intact.

212.    Bryce wrote, "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon" (Bryce, 1964). 3M had understanding of the chemical stability of the carbon-to-fluorine bond. It knew that its surfactants were immune to chemical and biological degradation in soils and groundwater.

213.    A 1971 internal memo by H.G. Bryce states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention." Hence, 3M understood at the very least that when its AFFF product ingredient was released to the environment it basically will never degrade[17].

214.    In natural environments, the surfactants do not undergo degradation of the carbon-to-fluorine bonds of the perfluorinated carbon chain. The non-fluorinated, functional group of the

---

[16] 3M, 1978 [3MA10036129].

[17] 3M, 1971 [3MA02496587].

chemical will partially degrade, yielding recalcitrant products such as PFOS, PFOA, and PFBA, which then resist further degradation. Basic weathering and degradation reactions, such as hydrolysis, occur at the non-fluorinated, functional group end of the molecule, producing the original fluorocarbon compound (Pearlson[18]). Depending on the surfactant these reduce to PFOS, PFOA, or PFBA.

215. Defendant 3M knew that the perfluorinated components in its AFFF product(s) when released to the environment would not degrade the perfluorinated carbon structure, but would remain intact and persist (Bryce, 1950). Nearly 30 years later and after the establishment of a robust market of AFFFs using such ingredients, defendant 3M finally got around to looking at the environmental risks its products pose. See a 1979 3M study[19] which reports on its surfactant FC95 citing multiple studies on toxicity and biodegradability. The study reports that "F-95 was found to be completely resistant to biological test conditions… it appears that waterways are the environmental sink for FC95…"

216. A 1978 3M biodegradation study[20] reports "… the results of the quite extensive study strongly suggests that FM3422 is likely to persist in the environment for extended period unaltered by metabolic attack."

217. 3M and other defendants chose not to disclose their knowledge of the inability of their surfactants to break down in the natural environment. They failed to warn that their products can contaminate drinking water sources for many decades despite their knowledge that this was a likely outcome from the use of their products.

---

[18] Pearlson, W. H., 1950. Fluorocarbon Derivatives. Fluorine Chemistry, 1(14): 463-522.

[19] 3MA10066577.

[20] 3MA00717615.

218.    All of the Defendants are sophisticated and knowledgeable in the art and science of formulating AFFF products and/or chemical feedstocks. They understood far more about the properties of and the biodegradability of their additives than any other customer. They chose not to use their knowledge to design safer products. See Ansul[21] which wrote the following about the biodegradation of AFFF: Biodegradation is a "measure of how completely a substance breaks down in the environment. The biodegradability of a chemical is expressed as a percentage determined by dividing the BOD by the COD and multiplying by 100. The chemical oxygen demand, COD, is the amount of oxygen needed to completely break a chemical down to its most oxidized state (for example: $CO_2$, $H_2O$, and HF) and is a measured analytical value. The biochemical oxygen demand, BOD, is an empirical test that measures a relative oxygen requirement. This test measures the oxygen required for the biochemical degradation of organic and inorganic material… For firefighting foams, this test is conducted for 20 days as opposed to the usual five days for other chemicals because the bacteria require a longer time to acclimate to the test solution of the foam… B[b]iodegradation is the percentage ratio of BOD/COD. If that resulting number is higher than 50%, the chemical is determined to be readily biodegradable. If it is below 15%, the chemical is determined to be not biodegradable. Ansul summarized its explanation by noting: If BOD/COD > 50%, then biodegradable; If BOD/COD < 15%, then NOT biodegradable.

219.    The information that Ansul published and widely distributes to its customers is both misleading and deceitful. Ansul's explanation ignores the fact that while the foam stabilizer additives biodegrade, perfluorinated surfactants do not. Dimitrov, et al.[22] report that PFAS when

---

[21] Ansul Inc., Environmental Aspects of AFFF and AR-AFFF, White Paper 1017, 2003.

[22] *Ibid*, Dimitrov, S., et al. 2004.

present in the environment does not undergo any further chemical, microbial or photolytic degradation or breakdown. Long before Dimitrov, 3M understood this as shown by its explanation of biodegradability in a 1976 study, noting that hydrocarbon components of a perfluorinated admixture will degrade leaving behind the perfluorinated components which do not biodegrade.[23] Once these substances undergo biotic or abiotic degradation, the perfluorinated moiety that remains will be PFOS. The rate of degradation to PFOS is not considered significant and over time these substances are all expected to degrade in the environment to environmentally persistent PFOS. These were facts that were known by 3M in the 1960s. These were facts that other AFFF chemical feedstocks manufacturers knew or should have known; and if they didn't then they simply created their products blindly and without concern as to whether they could cause harm to unprotected water resources and place communities at risk.

220.    Defendant 3M along with Defendants Ansul and likely others had intimate understanding of the poor biodegradation of their fluorochemical compounds. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS. 3M characterized the result of the study "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated".[24]

221.    The Ansul Company (Tyco), published a report in 1977 titled Environmentally Improved AFFF.[25] This report acknowledges that AFFFs were understood to be environmentally damaging and could pose potential negative impacts to groundwater quality. Ansul wrote: "The

---

[23] 3MA01252037.

[24] 3M, 1976 [3MA01252037].

[25] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977.

purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic…improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness." Its study showed it had the ability to reformulate its AFFF products to be biodegradable, but there is no evidence that any company bothered to do so.

222.    Also, in 1979 Defendant 3M carried out a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[26] More than 10 years after 3M began selling its AFFF products it wrote "there has been a general lack of knowledge relative to the environmental impact of these chemicals." This report ominously discloses "If these materials are not biodegradable, what is their fate in the environment?"

223.    Defendants failed to comply with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOS/A. See TSCA § 8(e).

**D.    PFAS-Containing AFFF and Resulting Water Contamination at the Fire College and Surrounding Area**

224.    For decades, Defendants  marketed, developed, manufactured, designed, sold, supplied, and/or distributed AFFF products containing PFAS used for training operations at the Fire College, including firefighting and explosion training.  Over this course of time, thousands of combined firefighters and firefighter personnel used the Defendants' AFFF products while training and/or working at the Fire College and Surrounding Area.

---

[26] 3MA00326828.

225.    The Fire College is a state owned and operated facility. It is part of the Florida Department of Financial Services, Division of the State Fire Marshall.

226.    In the 1940s, the Fire College commenced operations at its current address, 11655 NW Gainesville Road, Ocala, Florida 34482.

227.    The Fire College is operational year-round with both full-time personnel and trainees who rotate in and out of the facility each semester.  It includes onsite administrative buildings, dormitory facilities, a cafeteria, classrooms, and fire training areas.

228.    Defendants' AFFF products and/or chemical feedstocks were expected to and did reach the Fire College without substantial change in the condition on which Defendants sold it.

229.     At all times material, the Defendants were responsible for the design, manufacture, and distribution of thousands of gallons of AFFF products and/or the chemical feedstock used in AFFF products used and stored at the Fire College.

230.    Due to these training operations, AFFF was released into the surrounding air, soil, and groundwater at locations, including, but not limited to, the current fire training area located at the Fire College campus, and further contaminating the water supplies at the Fire College.

231.    On or about August 2018, the FDEP obtained samples from the three wells that provide the water supplies to the Fire College, including, the water running through the pipes, faucets, showerheads, appliances, sinks, and drinking water fountains located throughout the Fire College campus.  The FDEP determined that the PFOS and PFOA levels in the drinking water in two of the three wells measured a combined concentration of 250 ng/L in the supply well and 294 ng/L in the fire suppression well.  This is equivalent to 250 and 294 parts per trillion (ppt), which vastly exceeds the EPA's prior health-safety level at 70 ppt and even further exceeds the ATSDR recommended levels of 11 ppt for PFOA and 7 ppt for PFOS.

- 45 -

232.    On September 26, 2019, the FDOH completed sampling of dozens of private wells around the Fire College. More than a dozen private wells were found to be in exceedance of state and federal health advisory limits.[27]

233.    As a result of these findings, the FDEP implemented its Water Supply Restoration Program which provided bottled water to all interested affected private well owners, including Plaintiffs and Putative Class Members, whose results exceeded state and federal health advisory limits.

234.    On or about December 19, 2019, the FDEP completed comprehensive PFOA and PFOS soil sampling at the Fire College. Dozens of these soil samples yielded results that exceeded state and federal advisory limits.[28]

235.    On or about December 27, 2019, the FDEP completed PFOA and PFOS groundwater sampling at Lhoist, which is located adjacent to the Fire College. Similarly, the results included dozens of samples in exceedance of state and federal health advisory limits.[29]

236.    The "Surrounding Area" is defined as all locations within the outer (second) red circle in the FDEP's Florida State Fire College Well Sampling.[30]

---

[27] https://floridadep.gov/sites/default/files/DOH_Community_Sampling_Plan_rev5.pdf (last visited July 22, 2022).

[28] https://floridadep.gov/sites/default/files/Florida_State_Fire_College_Sample_Plan_Results_rev5.pdf (last visited July 22, 2022).

[29] https://floridadep.gov/sites/default/files/Lhoist_Sample_Plan_Results_rev4.pdf (last visited July 22, 2022).

[30] https://floridadep.gov/sites/default/files/DOH_Community_Sampling_Plan_rev5.pdf (last visited July 22, 2022).

237.    As a direct and proximate result of the failure to warn the personnel at the Fire College, including those most sensitive to contamination, AFFF and its constituents were permitted to enter the air, soil, and groundwater, ultimately entering the Plaintiffs' and the Putative Class Members' bodies.

238.    Upon information and belief, instructions, warning labels, and material safety data sheets that Defendants provided with the AFFF did not reasonably nor adequately describe the health and environmental hazards of AFFF that Defendants knew or should have known.

### E.    Plaintiffs' and Putative Class Members' Exposure to PFAS and Damages

239.    Plaintiffs and Putative Class members have been injured as a result of their unknowing consumption, inhalation and/or dermal absorption of PFAS from Defendants' AFFF products at concentrations hazardous to their health.

240.    Plaintiffs and Putative Class members have suffered from bioaccumulation of PFAS in their bodies as a result of their frequent consumption, contact, proximity to, use, and/or handling of AFFF in the course of their employment and/or training at the Fire College. Plaintiffs and each of the Putative Class members have been contaminated with PFAS due to their exposure to the PFCs in their concentrated forms through the use of AFFF. Additionally, or alternatively, Plaintiffs and Putative Class members have suffered from bioaccumulation of PFAS in their bodies as a result of PFAS contamination of the Fire College and Surrounding Area's water supply.

241.    The Plaintiffs and Putative Class members who trained or worked at the Fire College, have been unknowingly exposed to significantly elevated PFCs including at concentrations hazardous to their health.  The Plaintiffs and the Putative Class have suffered exposure, personal injury, bioaccumulation of PFAS in their blood which causes known cancers

and disease, property damage and the diminution of property value as a result of PFAS contamination of the water supplies.

242.    As a result of years of consuming PFAS contaminated water, Plaintiffs and the Putative Class have been unknowingly exposed for many years to PFAS at concentrations hazardous to their health.

243.    Plaintiffs and Putative Class members with property in the Surrounding Area have been damaged as a result of PFAS in their homes, soil, surrounding property and potable water supply.

244.    Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by the Plaintiffs as a direct and proximate result of their exposure to PFAS arising from their frequent exposure to the Defendants' AFFF products and/or chemical feedstocks, in an amount to be determined at trial, exclusive of interest, costs, and attorney's fees.

245.    Given that the long-term health effects of PFAS have not been exhaustively studied, and given that, based on studies that have been done, there is compelling evidence that both malignant and nonmalignant effects result from PFAS exposure, and because the full extent of latency of such effects has not yet been determined, periodic diagnostic medical exams for populations with PFAS exposure from contaminated water are reasonably necessary.

246.    Sustained exposure to PFAS substantially increases the risk to Plaintiffs and the Putative Class members of contracting the serious latent diseases alleged herein.

247.    As a result of the sustained exposure and substantial increased risk of contracting the serious latent diseases alleged herein, periodic medical examinations by qualified licensed medical professionals are both reasonable and necessary to permit early detection of latent diseases in the Plaintiffs and the Putative Class members.

F.      **AFFF Containing PFAS is Fungible and Commingled in the Groundwater**

248.    AFFF containing PFAS, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

249.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

250.    For example, the case here in the Fire College is typical: even though several areas were located at the Fire College where AFFF was used and entered the groundwater, investigators could not determine the identity of all the manufacturers whose AFFF or chemical feedstock containing PFAS contributed to the resulting groundwater contamination plume.  In the case at bar, however, is atypical to the extent that there still remained stockpiles of National Foam's AER-O-Foam XL-3 3%, on the Fire College site when the FDEP obtained its samples.

251.    Because precise identification of the specific manufacture of any given AFFF or chemical feedstock that was the source of PFAS found in a Class members' blood, a water well, or the groundwater, is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiffs and the Putative Class.

252.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF containing PFAS, at Plaintiffs' and the Putative Class Members' expense, to contaminate the Fire College's water supply, and to attempt to avoid liability for such contamination of the groundwater and poisoning of the Plaintiffs and the Class.

G.     **Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability**

253.     Defendants in this action are manufacturers that control a substantial share of the market for AFFF and/or chemical feedstock containing PFAS in the United States and are jointly responsible for the contamination of the water supply at the Fire College and for causing the damages and injuries complained of in this Third Amended Complaint.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF-containing PFAS at issue in this Third Amended Complaint. PFAS are fungible; it is nearly impossible to identify the exact Defendant who manufactured any given batch of AFFF or chemical feedstock containing PFAS found free in the air, soil or groundwater, and each of these Defendants participated in a state-wide and national market for AFFF and/or chemical feedstock containing PFAS during the relevant time.

254.     Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF or chemical feedstock containing PFA.

255.     Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

V.     **CLASS ALLEGATIONS**

**Class Definition**

256.     Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 254 above, and further allege the following.

257.     Plaintiffs, for themselves and on behalf of a Class of similarly-situated individuals, bring this action seeking to recover damages for injuries to their person, property damage and

- 50 -

diminution of property value, and/or for medical monitoring resulting from their use of PFAS containing AFFF products and/or from exposure to groundwater, surface water, and affected areas contaminated with PFAS at the Fire College, and the Surrounding Area, from AFFF products or chemical feedstocks that were manufactured, designed, sold, supplied and/or distributed by each of the above-named Defendants.

258.    Plaintiffs propose three (3) classes and sub-classes, and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery. The proposed classes, sub-classes, and Plaintiffs who seek to represent those classes, are as follows:

a.    **PFAS Invasion Injury Class**: This Class is composed of the following sub-classes:

(1)    Firefighter Sub-class: All firefighters, including instructors, trainees, and other firefighter personnel, at the Fire College and/or Surrounding Area, who have a detectable level of PFAS in their bodies and have suffered personal injury.

The proposed Class Representatives for the Firefighter Sub-class are Plaintiff David Battisti (firefighter and firefighter instructor at the Fire College) and Gordon Ditchfield (trainee at the Fire College).

(2)    Non-Firefighter Sub-class:  All non-firefighter individuals, including Fire College personnel, staff members, and/or and other individuals who live and/or work in close proximity to the Fire College or Surrounding Area, have a detectable level of PFAS in their bodies, and have suffered personal injury.

The proposed Class Representatives for the Non-Firefighter Sub-class are Plaintiffs Regina Saueracker (operations management consultant at the Fire College), Mary Ann Benson (administrative assistant at the Fire College), Susan Schell (employee at Fire College), Carol Smith (senior clerk registrar at the Fire College), Anita Pringle (administrative assistant at the Fire College), and John Holloway (maintenance superintendent at the Fire College).

b.    **Medical Monitoring Class**: All individuals, including firefighter instructors, trainees, other firefighter personnel, non-firefighter individuals,

Fire College staff members, residents in the Surrounding Area, and those that worked in the Surrounding Area, who have a detectable level of PFAS in their bodies and were exposed to PFOS- and/or PFOA- contaminated water at the Fire College and/or the Surrounding Area.[31]

The proposed Class Representatives are Plaintiffs, David Battisti (firefighter and firefighter instructor at the Fire College), Gordon Ditchfield (firefighter trainee at the Fire College), Regina Saueracker (operations management consultant at the Fire College), Mary Ann Benson (administrative assistant at the Fire College), Susan Schell (employee at the Fire College), Carol Smith (senior clerk registrar at the Fire College), and Anita Pringle (administrative assistant at the Fire College), John Holloway (maintenance superintendent at the Fire College), Mary James (resident in the Surrounding Area), Marvin James (resident in the Surrounding Area), Tim Brandenburg (resident in the Surrounding Area), Mathew Lawson (resident in the Surrounding Area), Mary Lawson (Resident in the Surrounding Area), and Adam Hill (Employee at Lhoist).

c.    **Property Damage Class:** All individual residents and business owners who own real property in the Surrounding Area whose private water wells or other water resources have been contaminated with PFAS. This Class can be readily ascertained by Census data, property records, and county records.

The proposed Class Representatives for the Property Damage Class are Plaintiffs, Mary James (citizen in the Surrounding Area), Marvin James (citizen in the Surrounding Area), Tim Brandenburg (citizen in the Surrounding Area), Mathew Lawson (citizen in the Surrounding Area), Mary Lawson (Citizen in the Surrounding Area).

259.    Each Plaintiff is a member of the proposed Class and Sub-class he or she seeks to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

260.    Excluded from the Classes are:

a.    Defendants, their officers, directors, management, legal representatives, employees, assigns, heirs, successors, and wholly owned or partly owned subsidiaries and affiliates;

---

[31] Under Florida law, plaintiffs are entitled to bring a claim for medical monitoring despite absence of physical injury and the court may create, supervise, and implement a medical monitoring plan under certain guidelines and circumstances. *See Petito v. A.H. Robbins Company, Inc.*, 750 So. 2d 103 (Fla. 3d DCA 1999).

b.    Any judges or justices involved in this action and any members of their immediate families;

c.    Any Class counsel or their immediate family members; and

d.    All governmental entities.

261.    Plaintiffs reserve the right to amend the Classes and Sub-Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional sub-classes, or modified in any other way.

**Numerosity and Ascertainability**

262.    This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because the number of impacted individuals, upon information and belief, has reached the thousands making individual joinder of class members' respective claims impracticable. While the exact number of Class members is not yet known, a precise number can be ascertained from the U.S. Federal Census records, the State of Florida, the FDEP, the FDOH, the Florida Department of Financial Services, Division of State Fire Marshall, Florida State Fire College records, and through other appropriate discovery.

263.    The resolution of the claims of the Class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the Class members will number in the thousands.

264.    Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

**Typicality**

265.    Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of Class members and arise from the same course of conduct by Defendants. Plaintiffs' persons, like

- 53 -

all Class members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to their use and/or consumption, inhalation or dermal absorption of PFAS from the Defendants' AFFF products and/or chemical feedstocks and/or exposure to the PFAS contaminated water at the Fire College.

266.    The claims of Plaintiffs are not only typical to all members of the classes and sub-classes they seek to represent, but they are also identical.

267.    All claims of Plaintiffs and the classes arise from the same violation and for as outlined herein, and all claims are based on the exact same legal theories.

268.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class members and represent a common thread of misconduct resulting in common injury to all Class members. The relief Plaintiffs seek is typical of the relief sought for absent Class members.

269.    Plaintiffs seek the same relief for themselves as for every other class member.

**Adequacy of Representation**

270.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the Class they seek to represent.

271.    Further, Plaintiffs will thoroughly and adequately protect the interests of the classes, having retained qualified, competent, and well experienced legal counsel in class action litigation, mass tort litigation, and environmental tort litigation to represent themselves and the classes.

272.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the Class.

<strong>Predominance of Common Issues</strong>

273.    There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members, making it appropriate to bring this action under Rule 23(b)(3). The answers to these common questions will advance resolution of the litigation as to all Class members. These common legal and factual issues include the following:

a.    Whether Defendants engaged in the conduct alleged herein;

b.    Whether Defendants knew or should have known that exposure to PFAS could increase health risks;

c.    Whether Defendants knew or should have known that their manufacture of AFFF and/or chemical feedstock containing PFAS was unreasonably dangerous;

d.    Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;

e.    Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their products;

f.    Whether Defendants became aware of health and environmental harm caused by PFAS in their AFFF products and/or chemical feedstocks and failed to warn users and Plaintiffs and the Class of same;

g.    The extent to which Defendants knew about the PFAS contamination in the water at the Fire College and/or the Surrounding Area;

h.    Whether the Defendants owed a duty to the Plaintiffs and the Class to refrain from the actions that caused the contamination of the water with PFAS;

i.      Whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of PFAS;

j.      Whether the risk of any health issue or bodily injury of Plaintiffs and the Class are attributable to exposure of PFAS in the Defendants' AFFF products and/or chemical feedstocks and/or to exposure to the PFAS contaminated water at the Fire College and the Surrounding Area;

k.      For the Medical Monitoring Class, whether Plaintiffs and Putative Class Members were exposed to water containing elevated levels of PFAS while working, training, or residing at the Fire College or Surrounding Area;

l.      For the Property Damage Class, whether the PFAS contamination caused and continues to cause:

1.      A continuous invasion of the property rights of the Plaintiffs and Property Damage Class Members such that the property values within the Surrounding Area have and/or continue to decline in value following the disclosure of the PFAS contamination; and

2.      Have substantially interfered with Plaintiffs' and the Property Damage Class Members' use and enjoyment of their property;

m.      Whether Plaintiffs and Class members are entitled to damages and other monetary relief and other equitable relief, including but not limited to punitive damages, and if so, in what amount;

n.      Whether the Members of the Classes have sustained damages and the proper measure of damages; and

o.      Whether Defendants are liable to Plaintiffs and the Classes for their actions.

274.    Further, common questions will predominate, and there will be no unusual manageability issues of this class action.

**Superiority**

275.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.

276.    Given that a great number of individuals have been impacted by the Defendants' conduct, the prosecution of separate actions by individual class members will create a risk of

inconsistent or varying adjudications, would as a practical matter be dispositive of the interests of other members not parties to the adjudications, would substantially impair or impeded their ability to protect their interests, and generate increased delays, expense, and waste judicial resources.

277.    Further, no unusual difficulties are likely to be encountered in the management of this class action. Given that a great number of individuals have been impacted by the Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## VI.    CAUSES OF ACTION

### COUNT I – NEGLIGENCE AND GROSS NEGLIGENCE

278.    Plaintiffs and Putative Class Members adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

279.    At all times material, the Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold, and/or distributed their respective PFAS containing AFFF products and/or the chemical feedstocks containing PFAS used in AFFF products in the regular course of business. Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

280.    Defendants also knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF or chemical feedstock containing PFAS, was

hazardous to human health, bioaccumulated in the blood, and caused serious health effects, including cancer.

281.    Defendants knew or should have known that firefighters working with and using their AFFF products would be exposed to PFAS released from the AFFF, and such releases would contaminate the air, soil and ground water at the Fire College and the Surrounding Area.

282.    At all times material, Plaintiffs and Putative Class Members consumed, inhaled and/or suffered dermal absorption of these hazardous PFAS contaminants released from the Defendants' AFFF products and/or chemical feedstocks. Plaintiffs and Putative Members' exposure to each Defendant's products, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its products, was harmful and substantially contributed in causing the Plaintiffs' and the Putative Class Members', injuries.

283.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

284.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF and/or chemical feedstock containing PFAS would result in the contamination of the well drinking supplies at fire training academies, like the Florida State Fire College, and the Surrounding Area.

285.    Defendants designed, manufactured, formulated, handled, labeled, instructed, controlled and/or sold PFAS contaminants and/or negligently, carelessly and recklessly recommended application and disposal techniques for products containing PFAS that directly and proximately caused contamination at the Fire College, in violation of Florida Statute Section

403.161(1), which sets a standard of care or conduct to protect individuals such as Plaintiffs, as well as the environment, from the type of improper activities engaged in by Defendants.

286.    At all times material, Plaintiffs and Putative Class Members, sustained bioaccumulation of PFAS in their bodies and have suffered personal injury as a result of their exposure to the PFAS contaminated water at the Fire College and the Surrounding Area.

287.    Plaintiffs and Putative Class Members' exposure to PFOS- and PFOS-contaminated water at the Fire College and the Surrounding Area, were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its products, was harmful and substantially contributed in causing the Plaintiffs and each of the Putative Class Members' injuries to their person.

288.    Defendants owed a duty to Plaintiffs and Putative Class Members to act reasonably and not place inherently dangerous PFAS into the marketplace when its release into the drinking water supplies was imminent and certain.

289.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and in emergency situations at fire training academies, like the Fire College, in such a manner that dangerous chemicals would be released into the environment.

290.    Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored in fire suppressant systems and tanks and that such systems and storage were used and maintained in such a manner that dangerous chemicals would be released into the environment.

291.    Aware of the dangerous and hazardous properties of AFFF, and the manner in which AFFF would be used, stored, and maintained at fire training academies, like the Fire

College, it was foreseeable that AFFF would contaminate the surrounding environment, groundwater, and drinking water supplies of the Fire College and the Surrounding Area.

292.    Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFAS into the surrounding environment, groundwater, and drinking water supplies.

293.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products and/or chemical feedstock.

294.    Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants therefore owed a cognizable duty to Plaintiffs and Putative Class Members not to contaminate their water supplies and the surrounding environment and groundwater with PFAS.

295.    Defendants had a duty to warn of the hazards associated with AFFF, containing PFAS, entering and poisoning the environment and groundwater.

296.    Defendants, as manufacturers, marketers, and sellers of AFFF or chemical feedstock owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF were aware of the potential harm PFAS can cause to human health and the environment.

297.    Upon learning of the release of the contaminants, all Defendants owed Plaintiffs and Putative Class Members a duty to warn and notify them of the release of the contamination before it injured Plaintiffs and the Putative Class Members and their property and/or to act reasonably to minimize the damage to Plaintiffs and their property.

298.    Defendants breached their duty by allowing PFAS to be released into the water supplies at the Fire College, and through their failure to warn and notify the end users of AFFF of the danger that PFAS would enter into the environment and groundwater.

299.    Each Defendant who was in the business of manufacturing, designing selling, supplying and/or distributing AFFF products or chemical feedstock during the times pertinent to this suit was negligent and/or failed to exercise reasonable care in one, some and/or all of the following respects, the same being the proximate cause of Plaintiffs' and the Class' injuries[32]:

a.    In failing to adequately warn Plaintiffs and Putative Class Members of the dangerous characteristics of their products in that each Defendant failed to warn Plaintiffs and the Putative Class Members that they could develop serious adverse health effects including, but not limited to, kidney cancer, testicular cancer, prostate cancer, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFAS emitted from each Defendant's products;

b.    In failing to place adequate warnings on or in the containers of said AFFF products and/or chemical feedstocks, containing PFAS to warn of the dangers to one's health of coming in contact with said PFAS, including PFOS and PFOA, and of the gravity of the risk and extent of danger that Plaintiffs were exposing themselves by working with and being exposed to said products;

c.    In failing to take reasonable precautions or exercise reasonable care to publish, adopt and enforce a safety plan and a safe method of handling and disposing of AFFF products;

d.    In failing to develop and utilize a substitute material to eliminate PFAS, including PFOS and PFOA, in the AFFF products or chemical feedstock manufactured, designed, sold, supplied and/or distributed;

e.    In failing to utilize the available substitute materials for PFAS, including PFOS and PFOA, in the AFFF products or chemical feedstock,

---

[32] The following subsections (a-g) contain allegations of fact (not allegations of law) supporting Plaintiffs' claim for negligence. Thus, Plaintiffs are not alleging that Defendants are subject to any legal requirement or legal duty not recognized under Florida law.

manufactured, designed, sold, supplied and/or distributed by the Defendants;

f.  In continuing to sell and otherwise distribute AFFF products and/or chemical feedstocks, when each Defendant knew at the time of sale and/or distribution of said products, that such products caused injuries including, but not limited to, kidney cancer, testicular cancer, prostate cancer, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFAS emitted from each Defendant's products; and

g.  In failing to adequately test their respective AFFF products and/orchemical feedstocks before offering them for sale and use so that Plaintiffs and Putative Class Members, would not consume, inhale, or sustain dermal absorption of PFAS released from the ordinary and foreseeable use of said products and thereby exposing the Plaintiffs and Putative Class Members to the development of fatal injuries including, but not limited to, kidney cancer, testicular cancer, prostate cancer, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFAS emitted from each Defendant's products.

300.    As such, the Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiffs and the Putative Classes, causing the contamination of the water supplies at the Fire College and the Surrounding Area.

301.    Defendants further breached the duties owed to the Plaintiffs and the Putative Class Members by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

302.    Defendants' breaches of their duties were direct and proximate causes of Plaintiffs' and the Putative Class Members' injuries, damages, and the imminent, substantial, and impending harm to their health.

303.    Defendants' breaches of their duties caused the water in well supplies at the Fire College and the Surrounding Area to become contaminated with unsafe and dangerous levels of PFAS.

304.    Plaintiffs and the Putative Class Members suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs and the Putative Class Members, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

305.    As a direct and proximate result of the negligent acts and/or omissions described in this Count, Plaintiffs and the Putative Class Members, were caused to suffer serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, embarrassment, inconvenience, loss of capacity for the enjoyment of life, the expense of medical care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition.  The losses are either permanent or continuing in nature and the Plaintiffs and Putative Class Members, will suffer losses in the future.

306.    Accordingly, Plaintiffs and the Putative Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons, in a sufficient amount to compensate them for the injuries and losses sustained, injuries to persons, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to

Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT II – STRICT LIABILITY

307.    Plaintiffs and Putative Class Members adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

308.    Each Defendant, their predecessors-in-interest and/or their alter egos are and/or have been a manufacturer, distributor, supplier, retailer, wholesaler and/or assembler of AFFF products or chemical feedstock containing PFAS.

309.    The products and chemical feedstocks, complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of the Plaintiffs and Putative Class Members during their lifetime and/or they were exposed to PFOS- and PFOA- contaminated water at the Fire College and the Surrounding Area.

310.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to the environment and to human health.

311.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF or chemical feedstock, containing PFAS, was hazardous to human health and the environment.

312.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling AFFF or chemical feedstock containing PFAS would result in the contamination at fire training academies, like the Fire College, and the Surrounding Area.

313.    Aware of the dangerous and hazardous properties of the AFFF and chemical feedstock, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF and chemical feedstock that did not contain PFAS.

314.    These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

315.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to the Plaintiffs that was caused by the Defendants' manufacture, marketing, and sale of AFFF or chemical feedstock that contained PFAS.

316.    Additionally, the AFFF and chemical feedstock that was manufactured, marketed, and sold by the Defendants contained PFAS that were so toxic and unreasonably dangerous to

- 65 -

human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, and selling these products was unreasonably dangerous under the circumstances.

317.    The AFFF or chemical feedstock manufactured, marketed, and sold by the Defendants was dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

318.    Defendants' products were in a defective condition and unreasonably dangerous, in that those products[33]:

a.     Did not provide an adequate warning of the potential harm that might result from exposure to PFAS emitted from the AFFF products, and/or chemical feedstocks and, alternatively, did not have adequate instructions for safe use of the products;

b.     Did not have warnings to persons, such as Plaintiffs and the Putative Class Members who had been, or reasonably may have been, exposed to Defendants' AFFF products and/or chemical feedstocks, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including providing histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects including, but not limited to, kidney cancer, testicular cancer, prostate damage, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies, and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFAS emitted from each Defendant's products;

c.     By design contained PFAS, including PFOS and/or PFOA, toxic chemicals that are deleterious, poisonous, and highly harmful to Plaintiffs and the Putative Class Members; or

---

[33] The following subsections (a-d) contain allegations of fact (not allegations of law) supporting Plaintiffs' claim for strict liability.  Thus, Plaintiffs are not alleging that Defendants are subject to any legal requirement or legal duty not recognized under Florida law.

      d.    Contained PFAS, including PFOS and/or PFOA, when and after it became feasible to design, manufacture and market reasonably comparable products not containing PFCs, including PFOS and/or PFOA.

319.    Plaintiffs and the Putative Class Members, unaware of the defective and unreasonably dangerous condition of Defendants' products at a time when such products were being used for the purposes for which they were intended, were exposed to PFAS, including PFOS and/or PFOA, released from the Defendants' AFFF products.

320.    Each Defendant knew that their products would be used without inspection for defects, and by placing them on the market, represented that they would safely do the job for which they were intended, which must necessarily include the safe handling, installation and replacement of said AFFF products.

321.    Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental and health impacts from PFAS, and potentially other toxic substances, that came from the use and storage of AFFF at the Fire College.

322.    As a result of Defendants' defective design and formulation of AFFF, the resulting contamination, the Plaintiffs have been injured in that their exposure to PFAS, and potentially other toxic substances has increased their risk of developing illnesses associated with this exposure as more fully described and/or significantly increased their fear and likelihood of developing those illnesses.

323.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to the Plaintiffs.

324.    As a direct and proximate result of the acts and/or omissions described in this Count, Plaintiffs and Putative Class Members, were caused to suffer serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, embarrassment,

inconvenience, loss of capacity for the enjoyment of life, the expense of medical care and treatment, loss of earnings, loss of the ability to earn money and aggravation of a pre-existing condition.  The losses are either permanent or continuing in nature and the Plaintiffs and Putative Class Members, will suffer the losses in the future.

325.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiffs and the Putative Class Members.

326.    Accordingly, Plaintiffs and the Putative Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons, in a sufficient amount to compensate them for the injuries and losses sustained, injuries to persons, and actual, consequential, and nominal damages, flowing from the Defendants' strict liability which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to

Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT III – MEDICAL MONITORING

327.    Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

328.    Medical monitoring is available to Plaintiffs and Putative Class Members who have yet to sustain a present injury as a stand-alone cause of action as the increased risk of developing the diseases and conditions discussed *supra* constitute an injury-in-fact and also as an element of damages associated with Plaintiffs and Putative Class Members other claims for those Plaintiffs and Putative Class Members who have already sustained an injury.

329.    Under Florida law, a claim for medical monitoring requires: (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that

normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *See Petito*, 750 So. 2d at 106-107; *see also, In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 852 (3rd Cir. 1990); *Krottner v. Starbucks Corp.,* 628 F.3d 1139, 1142 (9th Cir. 2010).

330.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF and/or chemical feedstock containing PFC's would result in the contamination of the water supplies of fire training academies, like the Fire College.

331.    Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

332.    Here, the Plaintiffs and Putative Class Members have been exposed to PFAS, and potentially other toxic substances at levels greater than normal background levels of PFAS, as a direct and proximate result of their use and/or consumption, inhalation or dermal absorption of PFAS from the Defendants' AFFF products. The FDEP's water samples demonstrate that PFAS levels detected in the contaminated water supplies at the Fire College and the Surrounding Area vastly exceeded the EPA's previous health-safety level of 70 ppt and even further exceeds the ATSDR recommended levels at 11 ppt for PFOA and 7 ppt for PFOS.

333.    As such, the Plaintiffs and Putative Class Members are at an increased risk of developing serious adverse health effects that resulted from the use, storage, and discharge of AFFF at the Fire College.

334.    As described more fully above in this Third Amended Complaint, PFAS exposure leads to the bioaccumulation of PFAS in the blood, seriously increasing the risk of contracting serious adverse and latent diseases including, but not limited to, kidney cancer, testicular cancer, prostate cancer, liver damage, thyroid disease, ulcerative colitis, immune effects and deficiencies,

and/or developmental effects to fetuses during pregnancy or to breastfed infants, as a result of being exposed to PFAS emitted from each Defendant's products. Medical tests currently exist that can determine the level of PFAS in the blood.

335.    Given that exposure to and bioaccumulation of PFAS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary. A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for Plaintiffs and the putative Classes to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFAS.

336.    Medical monitoring and testing protocols and procedures exist that make the early detection of the diseases correlated to the exposure to PFAS possible and beneficial. These may include a comprehensive medical questionnaire completed by the patient; periodic and comprehensive medical examinations by qualified licensed medical professionals; and specific testing based on the patient's history, PFAS exposure, symptoms or health consequences, clinical considerations and/or medical examination results. Available laboratory testing includes but is not limited to testing of biomarker and organ system function.

337.    For the early detection of the latent diseases alleged herein, the qualified licensed medical professionals may utilize specific evaluations and/or laboratory testing of biomarker and organ system function as follows:

    a.    Thyroid function:

        (1)    Thyroid stimulating hormone (TSH); and
        (2)    Free thyroxine (FT4)

    b.    Liver function:

        (1)    Albumin;

        (2)       Aspartate Aminotransferase (AST/SGOT);
        (3)       Alanine Aminotransferase (ALT/SGPT);
        (4)       γ-glutamyltransferase (GGT);
        (5)       Bilirubin; and
        (6)       Alkaline Phosphatase

c.      Uric Acid:

        (1)       Serum

d.      Kidney Cancer:

        (1)       Urinalysis

e.      Lipids:

        (1)       Total cholesterol;
        (2)       High-density lipoprotein (HDL);
        (3)       Low-densitylipoprotein (LDL); and
        (4)       Total triglycerides

f.      Evaluation for testicular cancer:

        (1)       Scrotal ultrasound followed by radiographic testing, measurement of serum tumor markers;
        (2)       Radical inguinal orchiectomy; and/or
        (3)       Retroperitoneal lymph node dissection

g.      Evaluation for kidney cancer:

        (1)       Urine culture
        (2)       Ultrasound of kidneys;
        (3)       Abdominal pelvic CT scan; and/or
        (4)       Cystoscopy

h.      Reproductive/infertility issues:

        (1)       Evaluation by a fertility specialist if, after 12 months, a couple has failed to conceive

i.      Gestational hypertension:

        (1)       Screening for evidence of gestational hypertension and pre-eclampsia for women in their second and third trimesters of pregnancy

j.   Androgen dysregulation:

(1)   Evaluations to assess androgen levels

k.   Indications of ulcerative colitis:

(1)   Evaluation of erythrocyte sedimentation rate;
(2)   Evaluation of serum C-reactive protein; and/or
(3)   Colonoscopic evaluation

338.   Using the data collected from comprehensive medical questionnaires completed by the patients, periodic and comprehensive medical examinations, laboratory testing and results, and other specialized evaluations, as alleged herein, qualified licensed medical professionals may predict, detect, and treat these diseases early, thus benefiting the Plaintiffs and Putative Class Members and reducing the likelihood of their premature morbidity, disability, or mortality.

339.   Accordingly, Plaintiffs and the Putative Classes seek damages from the Defendants, including an order requiring them to fund a medical monitoring program to be created, supervised and implemented by the Court.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in

interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT IV – TRESPASS BY ALL DEFENDANTS

340.    Plaintiffs and Putative Class Members adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

341.    This cause of action is brought pursuant to the laws of Florida, including but not limited to §376.313(3), Florida Statutes.

342.    Florida law states that trespass to real property is "an injury to or use of the land of another, by one who has no right or authority." *Brown v. Salary*, 19 So. 161 (Fla. 1896); *see also Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1254 n.1 (11th Cir. 2006) (quoting *Guin v. City of Riviera Beach*, 388 So.2d 604, 606 (Fla. 4th DCA 1980)).

343.    At all times material, Plaintiffs and Putative Class Members have been in lawful possession of their lands and real property.

344.    Defendants intentionally or negligently caused PFAS to enter and contaminate the air, soil, and groundwater on Plaintiffs' lands and real property.

345.    At all times material, Plaintiffs did not license, authorize, or consent to Defendants' PFAS to enter Plaintiffs' lands and real property.

346.    Defendants were aware that their PFAS chemicals used at the Fire College would trespass and encroach Plaintiffs' lands and real property.

347.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused substantial quantities of PFAS to be released into Plaintiffs' drinking water.

348.    These voluntary actions resulted in the immediate and continued trespass, injury, and damage to Plaintiffs, their property and right of possession of their property.

349.    Additionally, Defendants' decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy PFAS exposure and/or contamination after having knowledge and notice of the dangers associated with such exposure and knowing of said contamination were done with actual malice, and in wanton, willful and/or reckless disregard for the rights, health, and property of Plaintiffs.

350.    Accordingly, Plaintiffs seeks damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons which includes, but is not limited to, direct, consequential, and nominal damages as a result of the trespass which are the natural and proximate result of Defendants' conduct in an amount to be proven at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT V – PRIVATE NUISANCE

- 76 -

351.    Plaintiffs and Putative Class Members adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

352.    This cause of action is brought pursuant to the laws of Florida, including but not limited to §376.313(3), Florida Statutes.

353.    Under Florida law, a nuisance is "[a]nything which annoys or disturbs one in the free use, possession, or enjoyment of … property, or which renders its ordinary use or occupation physically uncomfortable." *Jones v. Trawick*, 75 So.2d 785, 787 (Fla. 1954).

354.    At all times material, Plaintiffs and Putative Class Members have been in lawful possession of their lands and real property.

355.    Defendants intentionally or negligently caused PFAS to enter and contaminate the air, soil, and groundwater on Plaintiffs' lands and real property.

356.    As a result of such PFAS contamination, Plaintiffs have been annoyed and disturbed in the use and enjoyment of their land and real property in various ways including, but not limited to, the FDEP and/or FDOH entering their property to conduct necessary PFAS private well and soil testing, installation of filtration systems to treat said contamination, delivery of bottled water, and Plaintiffs inability to use their private well water for bathing, cooking, and/or water consumption.

357.    Furthermore, Defendants' PFAS contamination, caused the Plaintiffs physical discomfort because Plaintiffs have recently been made aware that they have been unknowingly exposed to PFAS chemicals for years or decades, and said consumption has resulted, or may result, in personal injuries including, but not limited to, cancer.

358.    Accordingly, Plaintiffs and the Classes seek damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries to their persons and property,

in a sufficient amount to compensate them for the injuries and losses sustained, injuries to persons and property, and actual, consequential, and nominal damages, flowing from the Defendants' nuisance which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars

($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT VI – LOSS OF CONSORTIUM CLAIM ON BEHALF OF
## GERALD SMITH, DAVID PRINGLE, AND ALL OTHERS SIMILARLY SITUATED

359.    Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

360.    As a direct and proximate result of the foregoing allegations and injuries alleged in Counts I and Count II, above, Plaintiffs' spouses, Gerald Smith and David Pringle, for themselves and on behalf of all others similarly situated, have suffered and will continue to suffer from the loss of their spouse's services, support, income, consortium and the care and comfort of their society; and due to the injuries and disabilities suffered by Plaintiffs, Carol Smith and Anita Pringle, as alleged herein, Plaintiffs' spouses have also incurred and will continue to incur expenses for medical attention rendered to their spouse.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in

- 79 -

interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled, and demand a trial by jury of all issues triable as a matter of right by a jury.

## COUNT VII – FRAUDULENT TRANSFER (DuPont and Chemours Co.)

361.    Plaintiffs and Putative Class Members adopt, reallege and incorporate the allegations in paragraphs 1 through 277 above, and further allege the following:

362.    Plaintiffs and Putative Class Members seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

363.    Prior to and during 2015, DuPont was in the business of producing, making fabricating, designing, marketing, and selling chemical feedstocks containing PFOA and/or chemicals that can degrade into PFOA and/or other PFAS as part of their "performance chemicals business."

364.    Upon information and belief, in February 2014, DuPont formed Chemours as a wholly-owned subsidiary, and used it to spin off Dupont's "performance chemicals business" products line in July 2015.

365.    In addition to the transfer of the "performance chemicals business" products line, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFOA and other PFAS.

366.    Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture, design, marketing and sale of PFOA or other PFAS components for the use in AFFF products.

367.    As a result of the transfer of assets and liabilities to Chemours described in this Third Amended Complaint, DuPont limited the availability of assets to cover judgements for all liability for damages and injuries from the manufacture, design, marketing, sale of PFOA or other PFAS components for the use in AFFF products.

368.    DuPont acted (a) with intent to hinder, delay and defraud creditors, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably insufficient in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

369.    Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Plaintiffs, that have been damaged as a result of DuPont's actions as described in this Third Amended Complaint.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, and THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, for barring the transfer of DuPont's liabilities for the claims brought in this Third Amended Complaint, and for such other and further relief both at law and in equity to which Plaintiffs and Putative Class Members may show to be justly entitled and demand a trial by jury of all issues triable as a matter of right by a jury.

## VIII.  PUNITIVE DAMAGES

370.    Plaintiffs adopt, reallege and incorporate the allegations in paragraphs 1 through 369 above, and further allege the following:

371.    At all times material, Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs and Putative Class Members would result, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

372.    Defendants' conduct was so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, property, or rights of the Plaintiffs and Putative Class Members, and the Defendants actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

373.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA and PFOS, which

- 82 -

they knew to be carcinogenic, was not ingested by Plaintiffs and the Putative Class Members, warranting the imposition of punitive damages.

WHEREFORE, Plaintiffs, for themselves and on behalf of all others similarly situated, pray for judgment against the Defendants, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), TYCO FIRE PRODUCTS L.P., as successor-in-interest to The Ansul Company, BUCKEYE FIRE EQUIPMENT CO., CHEMGUARD, INC., NATIONAL FOAM, INC., KIDDE-FENWAL, INC. (f/k/a Fenwal Inc.), individually and as successor-in-interest to Kidde Fire Fighting, Inc., E.I. DUPONT DE NEMOURS & COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, AGC CHEMICALS AMERICAS, INC., AMEREX CORPORATION, ARKEMA, INC., individually and as successor-in-interest to Atofina, S.A., ARCHROMA MANAGEMENT, LLC, BASF CORPORATION, individually and as successor-in-interest to Ciba, Inc., CARRIER GLOBAL CORPORATION, individually and as successor-interest to Kidde-Fenwal, Inc., CHEMDESIGN PRODUCTS, INC., CHEMICALS, INC., CLARIANT CORPORATION, individually and as successor-in-interest to Sandoz Chemical Corporation, CORTEVA, INC., individually and as successor-in-interest to DuPont Chemical Solutions Enterprise, DEEPWATER CHEMICALS, INC., DYNAX CORPORATION, and NATION FORD CHEMICAL COMPANY, for damages in excess of Five Million Dollars ($5,000,000), for interest, and for such other and further relief both at law and in equity to which

Plaintiffs and Putative Class Members may show to be justly entitled, including punitive damages, and demand a trial by jury of all issues triable as a matter of right by a jury.

IX.    **PRAYER FOR RELIEF**

374.    WHEREFORE, Plaintiffs, DAVID BATTISTI, GORDON DITCHFIELD, REGINA SAUERACKER, MARY ANN BENSON, SUSAN SCHELL, CAROL SMITH and GERALD SMITH, her husband,  ANITA PRINGLE and DAVID PRINGLE, her husband, JOHN HOLLOWAY, MARY JAMES and MARVIN JAMES, her husband, TIM BRANDENBURG, MATHEW LAWSON, MARY LAWSON, and ADAM HILL, for themselves and on behalf of all others similarly situated, demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

a.    certification of the proposed Classes;

b.    a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the Classes;

c.    an order establishing a medical monitoring protocol for Plaintiffs and the Class;

d.    an order requiring that Defendants to fund the medical monitoring protocol;

e.    an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

f.    an order barring the transfer of DuPont's liabilities for the claims brought in this Third Amended Complaint;

g.    an order for an award of attorney fees and costs, as provided by law;

h.    an award of pre-judgment and post-judgment interest as provided by law; and

i.    an order for all such other relief the Court deems just and proper.

## X.     DEMAND FOR JURY TRIAL

375. Plaintiffs, DAVID BATTISTI, GORDON DITCHFIELD, REGINA SAUERACKER, MARY ANN BENSON, SUSAN SCHELL, CAROL SMITH and GERALD SMITH, her husband, ANITA PRINGLE and DAVID PRINGLE, her husband, JOHN HOLLOWAY, MARY JAMES and MARVIN JAMES, her husband, TIM BRANDENBURG, MATHEW LAWSON, MARY LAWSON, and ADAM HILL, for themselves and on behalf of all others similarly situated, demand a trial by jury of all issues so triable as a matter of right.

Dated: July 27, 2022            Respectfully submitted,

**THE FERRARO LAW FIRM**

*/s/ James L. Ferraro, Jr.*
James L. Ferraro, Jr., Esq.
Florida Bar No.: 107494
james@ferrarolaw.com
Natalia M. Salas, Esq.
Florida Bar No. 44895
nsalas@ferrarolaw.com
Dick M. Ortega, Esq.
Florida Bar No.: 113054
dortega@ferrarolaw.com
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone (305) 375-0111

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2022, I electronically filed the foregoing document with the Clerk for the United States District Court, District of South Carolina. The electronic case filing system (CM/ECF) will send a Notice of Electronic Filing (NEF) to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By:     */s/ James L. Ferraro, Jr.*
         James L. Ferraro, Jr., Esq.